And our next case is National Labor Relations Board v. Siren Retail Corporation doing business at Starbucks. Case number 22-1969. I'll let counsel arrive. And to make clear, if it isn't already, that Starbucks will begin the argument first and then we'll proceed with the board next. I'm sorry. Thank you, Your Honor. May it please the Court, my name is Gregory Fisher. It's my privilege to represent Starbucks. I'd like to reserve two minutes. Before I begin, did the Court have any particular questions or anything it would like me to concentrate on in my presentation today? Before we get to Part 2, there's jurisdiction. Given our case law and then also the D.C. Circuit case, what you're asking us to do would basically create a circuit split on jurisdiction. So I'd be interested in your thoughts on that. All right, Judge McKeown. So this is a test of certification case. We challenge certification principally because, in our view, the regional director and the board got the facts wrong and did not faithfully apply their own precedent. Separate from that, there is, as Judge McKeown notes, what we see is a very important jurisdictional argument regarding the question as to the form of the order here, the decision from the board. Is this a final decision that's susceptible to appellate jurisdiction? As we see it, no. Let me address Longmont first, the D.C. Circuit case. I read the opinion and I looked at the briefing. I don't even see that they ever raised a jurisdictional issue there. As I understand it, the argument they raised was that somehow not having the remedy aspect of the decision determined created a genuine issue of material fact. Not impugning the colleagues who presented that argument, but I found it a little bit confusing myself, so I wasn't surprised at the result. The court addressed it even if it didn't give a real lofty explanation, but then the court also cited Stevens Media, which, if you go back to Stevens Media, has a more expanded discussion. Given that every court has a duty, as you know, to satisfy itself as to jurisdiction, I'm not sure we can be quite so dismissive of the Longmont case. Thank you, Judge McKeown. Let me present the jurisdictional issue as quickly as I can and move on to the merits, understanding that the court may be inclined to find jurisdiction. As we see it, any component of a decision has to have both the liability and the remedy determined. Compliance proceedings are something separate, but here we're talking about a remedy that doesn't even exist yet. In fact, it's precluded by current board precedent. So when the general counsel argued that the board overrule XLO, which has stood the test of time since the early 1970s, they're arguing for creation of an entirely new remedy now. And the board, in its decision, severed that, saying that we'll look at that, take it under consideration. We're over a year down the road yet. We still don't have determination from the board. Doesn't that cut against your argument in that case? Because it's such a distinct issue that would have to require overturning XLO, that it really is a discrete topic than the other issue about the cease and desist order, which seems to me to be final, self-contained, a final adjudication of the merits of the party's claims. Why isn't the finality as to that discrete issue sufficient for us to retain jurisdiction over that? So I look at the best way I can answer that, Judge Sanchez, is looking at this court's decision from the early 80s in the International Bridge case, where the court, in a comparable context, admittedly a little bit separate, but the court was talking about, you know, what is or is not reviewable and what's the final order for purposes in this context? And the court concluded that, hey, even though there are some ancillary aspects about compliance proceedings that still need to be decided, that doesn't prevent us from exercising jurisdiction because before the court we have liability and we have the remedy. Those have been fixed. So the final decision has fixed the liability and fixed the actual determination of the remedies. We don't have that here. And that would be how I would distinguish it, and that would be where I would urge the court to concentrate on. But if I may, moving on from that, let me talk about the merits here because I think that's really maybe where this case winds up. Board precedent recognizes that manual elections are the gold standard. Mail ballots are permissible in certain limited circumstances. In Alaska, we see it a lot because of North Slope workers. In the context of the pandemic, the board issued a decision in November of 2020. The court has seen it. Hesperus, we've briefed it. And the court identified a range of five factors by which the regional directors could exercise their discretion to order a mail ballot election and derogation of a manual election. Here, the regional director studied the briefing and concluded that there was only one factor in his estimation that militated in favor of a mail ballot election, and that was the so-called 14-day trend. And so he looked at two data points. He didn't look at an actual trend. So first of all, he got the methodology wrong. Well, is there anything in Hesperus, and I say it Hesperus, maybe you say it better, that says how we define what a 14-day trend consists of? There isn't except for this. Or how the regional director should calculate the 14-day trend, a particular type of statistical analysis for checking the 14-day trend. Those aren't in Hesperus. So a couple of options. I mean, there are things in Hesperus. It mandates the regional director use Johns Hopkins data. It mandates they consult the most recent available county-level data regarding the 14-day trend. It mandates that the 14-day period should be measured from the date of the regional director's determination or as close to that date as available data would allow. All those they did. All you're challenging is they didn't do a 14-day trend the way you want it done, and there's nothing in there that says what I'm supposed to define for a 14-day trend or what particular type of statistical analysis I ought to use. Nothing in there. So let me answer that this way, Judge Smith. First of all, the board referenced Johns Hopkins University. I think the court should assume then that the board was cognizant of what's the methodology that Johns Hopkins uses, and they use a rolling average. They don't look at two data points. But there's nothing in Hesperus that says that's the way it is. So advancing that argument further then, certainly Member Kaplan understood what a 14-day trend was, and in his dissent he pointed out the regional director did not rely upon a 14-day trend. Well, that was his opinion. I mean, all I'm trying to get to is basically it seems to me that this comes down to a standard of review test. The regional director has the discretion to order the mail-in ballot or not, and when the board reviews what the regional director does, the board has to give the regional director that discretion. And as long as the board applies the law that's out there, then the discretion of the regional director is unbounded. And when I review that above them, it seems to me I'm doing the same thing. So that's why I'm asking you these questions. If it didn't violate any law that I find, then how is it I can say it's an abuse of discretion by the regional director and therefore the board was wrong? So aside from the methodology, maybe I should clarify, Member Kaplan, he was on the majority in Hesperus. So I think the court should assume or could fairly assume that he understands. I wish that would be the way it is, but that's never what they do with me in my next decision that comes down the pike. They never do that. McEwen often says, I didn't know what the hell I was talking about there. You're talking about what I didn't know, not what you didn't know. Anyway, all I'm trying to do is say this is a tough decision. I might have come down somewhere differently myself, but I'm using the standard review here. The standard review says this, and I see what the board had to do with the standard review. So even if the board didn't really like what they did, as long as they didn't abuse their discretion, they had to do it. And one way to abuse discretion is not apply the law. That's why I say, where in Hesperus does it say that? Because if it said it, I'd be right with you. But it doesn't. Well, one thing we can all agree is that he's got to get the facts right, correct? And the regional director concluded that the most recent available data was from he said it was March 16. I think what he meant was March 14, but leave that aside. On Monday, March 14, the most recent available data was 742 reported cases in King County. But actually, the most recent available data, and this is directly from Hesperus, Your Honor, you actually look to the date of the regional director's decision. The regional director's decision was dated March 17. On March 17, the actual case count was 473. But it doesn't say the date. It says they're as close to the date as the data would allow. And this data was available on March 17, Your Honor. You know what? Another thing that I didn't understand, maybe you can clear up, is you made that argument, but then I had written down that Starbucks had looked at March 18 and 21, which post-dated the decision. I'm baffled by that. Maybe you can clear that up. Right. Well, what we've tried to do in our briefing, both before the regional director and also before the board and before this court, is to give the court within the compass of page limits, of course, give the court some understanding of how this trend is developing. Because let's go before. These cases were bouncing all over the place, as we know, in that time frame. So I don't see any justification following asperis that we would look at dates that post-dated the decision. So great. And I think you're right. Two things you just said. One thing you said, Judge McHugh, in these cases were bouncing all around. That's exactly why all of the competent health authorities say we have to look to an average, we have to look to a rolling average and not data points, not to raw data, because the reporting cycles are affected by a whole host of factors, and we've briefed those. There's things like delays in the reporting, mistakes in the reporting. I think the board was making an argument that even if it should have always been a rolling average, there were several intervening dates between the 14-day period in which Starbucks could have provided data as to what happened on this date, reporting on that date, on that date. Did Starbucks provide those dates to show this was just an upward trajectory the whole time or going down? Thank you, Judge Sanchez. That's in the briefing, and you'll see that on Monday, March 7th, there were 494 cases. On Wednesday, March 9th, there were 478. On Friday, March 11th, there were 587. So, again, you know, the point I'm trying to convey, and I'm hoping, you know, I'm certainly not an epidemiologist myself, but the point I'm trying to convey here is that anybody looking at this data would say, wait a second, you know, you've got 663 here, you've got 742 there, but in between you've got these range of dates and data that are way down here. How am I going to analyze this? Every question that's been asked here I think fits hand in glove with the point that we've been trying to make, is that nobody can really parse out what the regional director intended here, except as Member Kaplan noted, quite clearly he identified two data points, 663 and 742. I can tell you I'm into my rebuttal time, so I'll try to wrap this up, but I can tell you that our briefing addresses all of these points, including the 14-day trend and the averages and how the health competent authorities are all looking at how can you meaningfully manage this information as it's coming in. Just as Judge McEwen noted, it's bouncing all over the place, and so the methodology that they've applied is to look at a rolling average, but forget the rolling average, just look at the facts. The regional director was wrong on the facts, and the ambiguities here, he's got to have the facts right. His decision has got to be supported by substantial evidence. That's what reasoned decision-making is all about. If he doesn't have the facts right, this court should not grant the petition to enforce. The best way to clarify all of these ambiguities is to send it back to the regional director and say, hey, please explain how you reached this decision. Please explain what methodology you used or what you were looking at. That's what we requested before the board, and that's what Member Kaplan thought was the best approach to. I think that's the best approach that I would urge the court to do. I've got 40 seconds. I'll save that for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Michael Hickson for the National Labor Relations Board. The employees in this case chose the union as their collective bargaining representative in a board-certified secret ballot election. Because the board acted well within its wide discretion in deciding to conduct that election by mail, the court must uphold the board's election certification. As a result, the company's admitted post-certification refusal to recognize and bargain with the union violated the act. Additionally, the board's unfair labor practice order, which mandates immediate relief to remedy the company's ongoing violation of its employees' statutory rights, fully satisfies the judicial review provisions set forth in Section 10 of the act, as well as this court's general administrative finality principles. Moreover, a core policy objective of the act strongly supports the court's prompt review here, and that is the objective of expeditiously determining and effectuating employee-free choice concerning representation at work for the purpose of collective bargaining. Can I ask, Mr. Hickson, on the D.C. Circuit's Longmont case, the court did review jurisdiction on its own by itself, but didn't really give much by way of explanation as to why it arrived at the ability to review this case. Does that limit its guidance in some respects? I don't think so, Your Honor, because although the issue was not raised by the parties, the court itself, as you note, raised the issue itself and addressed it, and it determined that the court had jurisdiction over the board's, quote, final order, and it further explained, quote, that the board severed a remedial issue for future consideration, does not affect our jurisdiction to consider the employer's petition for review, and to adjudicate issues that the board has resolved. And it cited Stevens Media, which, as Judge McEwen noted, has a more expansive discussion, I guess, of administrative finality, including the Bennett v. Speer principles. If I don't get to Stevens Media or Longmont United Hospital, I didn't find that your mandatory authority cited addressed this situation. In fact, your cases you cited involved orders where back pay was ordered but not yet calculated, and this is not that at all. No, Your Honor, respectfully, we did cite cases in our brief, including a case decided by this court, which is the J&R flooring case, where the court reviewed the non-server. But that isn't exactly this kind of order. It is, Your Honor. This kind of order said what you say it said, but then it said we'll leave a big issue, which we have precedent outstanding, tell us we cannot do, off to the side. So, Your Honor, the J&R flooring case, Pacini flooring, it's called before the board, and then it was reviewed and enforced by this court under the name of J&R flooring. Right. As well as the Freeman decorating case, which was reviewed by the D.C. Circuit, as well as the other case whose name escapes me. I know the D.C. Circuit's Stevens Media case. I know the D.C. Circuit's Longmont United case. I mean, I've got the D.C. Circuit coming down headlong on what you're saying here, but I'm trying to find something that my court has said that would lead me that direction. Right. It's true, Your Honor, that in J&R flooring the court didn't address the issue, but it reviewed the non-severed aspects of the board decision, and those three cases that we cite together in our brief, the two D.C. Circuit cases along with the J&R flooring case, are all cases where, like here, the board severed a remedial issue. They are not cases. They are not cases where the board reserved an issue for a compliance proceeding. They're cases where the board severed a remedial issue. It was severing whether the board should order electronic notice posting in J&R flooring, severing where the board should adopt a standard of compounding interest rather than simple interest, and severing an issue of whether a large group of employees out of a hiring hall might be entitled to instatement and back pay remedies. Those are all distinct remedial issues that the board severed in those cases, and in each of the cases the court reviewed the non-severed aspects of the decision. You're right, Your Honor, that there's not a lot out there in terms of our statute and administrative finality principles addressed expressly, but we submit that we fully satisfy all of the characteristics of the type of order identified in Section 10C, referenced in 10E, that makes an order final. Yes, Your Honor. We've got here a complaint issued by the general counsel alleging unfair labor practices, formal proceedings allowing for the submission of evidence, the board's consideration of that evidence, finding of jurisdiction, findings of fact, conclusions that the company violated the statute, and the issuance of a remedial order providing for both cease and desist and affirmative relief. That's all that 10C requires, and we've met all of that. So if the board took up this Accelo issue and either reaffirmed or changed its view, would that then be a separate final order reviewable? Your Honor, it's hard to say because I don't know what the board will do in that severed proceeding. At some point, if the company were actually subjected to the requirement to pay a monetary remedy, yes, it would become reviewable. I can't say with certainty whether it would be immediately reviewable because it just might depend on what the board does in that case. I don't know if there could be questions about whether the company is immediately aggrieved by the order or whether there could be ripeness questions, but that's something that could be addressed when that future order is issued. But isn't that the tough part of whether this is really a reviewable order in that the company is not truly knowledgeable about whether it can protect its interests in this subsequent order by doing some appeal? I don't think so, Your Honor. Again, if the company is subjected at some future point to monetary remedial relief, then the board's decision, including the initial decision to adopt that new type of remedy, would be reviewable by this Court, absolutely. At some point. I just can't say in candor to the Court that I know for a fact it would definitely be immediately reviewable. I guess I'd also point out that I think, Your Honor, Judge Smith, I think you mentioned this question about the point that, yes, if the board were to choose to adopt this remedy at some point, that that would involve overruling Excello. But, I mean, that's an issue that's not before the Court right now. What we have right now is an order to bargain, and the board is trying to expedite bringing the company to the bargaining table in order to make real the employee's choice. The only reason I said that is because that's, in fact, what they were told by General Counsel to look at, and if they did do it or give them a remedy, that would overrule Excello, right? Absolutely, Your Honor, but that has no bearing, I respectfully submit, on the finality of the order that is before the Court right now. If you look at the underlying purposes of finality requirements, it's to prohibit meddling or interference in the agency's ongoing affairs. We don't have that here. You've got the agency, myself as a representative, coming here asking this Court to enforce the board's order. So there's no question of interference in agency determinations. You have the question of whether the record is adequately developed for judicial review. There's no question that that's the case here. And then you have the consideration in some cases about whether there may be a waste of judicial resources. And there's no danger of that because the board has issued its absolute final, last, and unalterable word on every issue that is before this Court right now. Can I switch you over to the merits of the case? Yes. I'd like you to respond to counsel's argument that the regional director erred by relying on Monday's data rather than when he could have, I believe it was he used Wednesday, the 17th data, and that would have reflected a different data point. So a few points. I guess I'll start with the fact that that data would not actually have been available. First of all, ASPIRA says as close to the determination as allowable, allowing for the regional director's flexibility in applying the standard. So the regional director consulted the website as his decision notes on March 16th. So on the day he consulted the website on March 16th, the March 17th data would not have been there. But moreover, the March 17th data would not even have been there on March 17th because it's undisputed that the way the formatting of the Hopkins website was such that it looked backwards 14 days with a chart designating the days as day negative 1, negative 2, and so on until you get to day negative 14. So the report for March 17th would not have been published on the website until March 18th. So that data would not even have been available to the regional director on the date he issued his decision. In fact, with respect to the Hopkins data. So the data would never be on the day of. It's starting with at a minimum minus 2. It's on the day you look. It starts with the day prior to viewing the website, and then it goes backwards 14 days. Okay. So, right. So the dispute seems to be that how you interpret 14-day trend. So do you just take these two numbers, point A, point B, and then see if there's an increase or a decrease? Or, as Starbucks argues, it's more likely that what Asperis meant was the rolling numbers. So what is the board's response to that? Our response would be that the Asperis decision did not mandate how regional directors were to interpret or apply the data in concluding whether there's a 14-day trend, and therefore the regional director's well-established broad discretion to decide the method of election is not restricted in that regard as to which dates exactly, whether he needs to look at both the first and last or also the intervening dates. It's also undisputed, or at least I thought it was undisputed, that the Hopkins website, at least as to the county-level new case data that we're talking about here, does not actually show averages. I thought that was the whole basis for the company saying, well, one of the bases for the company's argument that the regional director erred was that he should not have relied on the points he relied on because they didn't show rolling averages. So they don't show rolling averages. And, yeah, so, sorry, Your Honor, I kind of lost my train of thought there. Oh, I guess just quickly for that, is your point that if Asperis said refer to Johns Hopkins data, the implication behind that is it was okay with a regional director being able to use two data points from that Johns Hopkins data rather than a rolling average. Right. It left, I don't see how it would have even been possible to do a rolling average with the Johns Hopkins data because the Johns Hopkins data does not show averages. And I thought that was undisputed in these proceedings.  It was within the regional director's broad discretion in how he decided to interpret that data. Starbucks might prefer that he interpreted it in a different way. That does not carry their heavy burden of establishing that what he did was an abuse of his broad discretion. I also want to emphasize that Starbucks has never articulated any alternative way that the regional director could have analyzed the four intervening dates that came between the two chronological polls, the first and the last. It has never articulated any alternative analysis that the regional director could have applied to that data, even if it were properly before the court, that would have shown that it was decreasing, that the case counts were decreasing. Instead, what they do in terms of the Hopkins data is they rely on case counts that were only published after the decision was issued and that they never presented to the regional director. Indeed, they could not have presented to the regional director because those were not published data points at the time of his decision. Your Honors, I'm out of time. I would, of course, welcome the opportunity to answer additional questions. Otherwise, the board asks for full enforcement. No other questions. Thank you very much. Good morning, Your Honors, and may it please the court. I'm Ben Berger on behalf of the Intervenor Workers United, and with me is my colleague, Demetria Glitzen, both from the firm Bernard Glitzen and Lavit. I want to make just three points with my two minutes. First, there is not a shred of evidence that Respondent has presented that a single employee of the roastery was actually denied the opportunity to vote, and under LEMCO construction, that moots its entire challenge to the method of election. Second, what Respondent is doing with its interpretation of ASPRAS is proposing a test that directly conflicts with the straightforward and expressly flexible method that the board articulated and would replace it with, as the counsel for the board ably demonstrated, a completely technical and unwieldy test that was never actually discussed. And more than that, it would void an already held election because a regional director failed to divine the standards of that test. The last point I just want to make is that it brings us back to reality. It's been over a year and a half since workers voted in a free and fair election at the roastery for union representation. No bargaining has occurred in that time. Respondent's refusal to recognize the results of an actually held election based on its preferred method of distributing ballots is an insult to employees' free choice, which the NLRA is meant to uphold. Now, if I could address a point Your Honor had asked earlier, what does ASPRAS actually say about how you determine a 14-day case count, I would direct your attention to footnote 20 of the decision, which said, for either statistic, the 14-day period shall be measured from the date of the regional director's determination or as close to that date as available data allows. And then it said, we acknowledge that some flexibility may be required on this count. Now, it said particularly with respect to the positivity rate, potentially because there are more variables at play there. But it was very clear, the regional director gets flexibility in determining that date, and that's all that ASPRAS actually said on the point. I'm happy to answer any questions you have. Thank you. Thanks again. So I've got 39 seconds. Mr. Hickson made the comment, I don't know what the board will do. That's why there's no final order here. I think kind of lost in all of this is the fact that the bargaining order is linked directly with the remedy. So we would ask the court to look at that. Everything Mr. Hickson said about, you know, he was commenting about what the regional director did, none of that's in the record. We don't know what the regional director did. We don't know what he decided or why he did what he did or what he looked at or when he looked at it. All we have is his determination. It's clearly wrong on the facts. We just ask the court to look at our briefing again. Finally, the 14-day trend, you know, this is no big mystery. I'm not an epidemiologist. I'm not a health doctor. But you can just read the available literature. You just take that case count in a 14-day period, average it out, and then you look to the preceding 14 days. You can do that here. You've got the link to the archive data. And that's exactly what he would have done in your mind, and it would have been his discretion to do it. But given that there was nothing in aspirin which required that he use the 14-day average the way you want to, and I don't know how it was, I'm having a tough time understanding how he abused his discretion. So I would ask, Judge Smith, I would ask you to consider what Member Kaplan said in his dissent. Think about what's a reliable methodology for looking at a 14-day trend. Don't tell me to look at Kaplan's. I've read Kaplan's, but, frankly, I've been in the dissent a lot of times, and that doesn't have anything to do with discretionary decisions. He has his opinion. Others have others. When I'm looking at a discretion, people seize on evidence that I may not seize on. They make decisions on ways that I may not make them. But that doesn't mean if I'm to give them wide discretion that I can substitute my opinion up here on the Ninth Circuit for them. But here's what would, is that recognizing that we're according discretion to any agency official, we're expecting them to exercise that discretion in a reasonable manner, applying reasonable methodology. And all competent epidemiologists and health doctors looking at pandemic and pandemic information point to using a rolling data and a rolling average. It's the only reliable way, as Judge McEwen noted. Otherwise, the data is bouncing all over the place. There's no way you can meaningfully or reasonably interpret that data, and that's what the Court should be focusing on. I appreciate the time this morning. It's always, I'm grateful for the opportunity to argue before the Ninth Circuit any chance I get. Thank you again, Your Honor. I would ask the Court to deny the petition to enforce. Thank you. And thank you both, counsel, for your helpful oral arguments. The matter will stand submitted, and the Court is adjourned. All rise.
judges: McKEOWN, SMITH, SANCHEZ